UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 16-23468-MC-O'SULLIVAN

IN THE MATTER OF THE EXTRADITION
OF ANDRES FELIPE ARIAS LEIVA

_____/

**GOVERNMENT'S SUPPLEMENTAL REPLY IN FURTHER OPPOSITION TO EMERGENCY MOTION TO DISMISS COMPLAINT AND VACATE ARREST WARRANT FOR LACK OF JURISDICTION, AND REQUEST FOR A HEARING**

The United States of America, by and through the undersigned Assistant United States Attorney, files this supplemental reply in further opposition to the motion filed by Andres Felipe Arias Leiva ("Arias Leiva") to dismiss the complaint and vacate the arrest warrant in this case.

The United States's extradition treaty with Colombia, S. Treaty Doc. No. 97-8 (1981) (hereinafter "the Treaty"), entered into force on March 4, 1982. Since then, the Treaty has represented an important component of U.S. foreign policy in Latin America. Its continuing validity implicates significant U.S. national security interests such as countering the global drug problem, and ensures the availability of a vital international law-enforcement tool for our government. Because the Constitution commits the conduct of foreign affairs to the Executive Branch, the case law is clear that the Court should defer to the Department of State's well-reasoned conclusion that the Treaty remains in force, and should refrain from deciding the political question of whether the Treaty was properly ratified. The Court's analysis can, and should, end here.

Regardless, the Treaty itself, as well as the record in this case, leave no doubt that the Treaty remains in force. The governments of both the United States and Colombia unambiguously and unequivocally maintain that the Treaty has been, and remains, in force. While Arias Leiva and others may misstate the positions of the governments, the simple and inescapable fact is that the official position of both governments is that the Treaty is in force.

1

Both parties to this litigation previously agreed that this fact ends any inquiry into the Treaty's validity. The United States has consistently maintained that the Treaty is in force, and, for his part, Arias Leiva took the position that "[w]hen both sides say [a treaty] is in force, then, it is in force." [DE 53, Tr. of Hr'g, at 7.] Recognizing some common ground between these positions, this Court explained that "if Colombia came in here and said, yes, this treaty is in effect," the United States would "win" on the pending motion because the question of whether the Treaty is in force "is up to the two governments." [Id. at 26; see also id. at 40-41.] Colombia has now provided a diplomatic note stating that "it must be highlighted that the [Treaty] continues currently in force." [DE 54, Ex. 1, at 9.] Nevertheless, when confronted with the official position of the Colombian government, Arias Leiva attempts to circumvent it by arguing that that government incorrectly states its own position. He also asks this Court to find that the Treaty is not in force even though both parties say otherwise. His argument is premised on myriad erroneous factual assertions. For example:

- Arias Leiva incorrectly asserts that Colombia is not bound by the Treaty. Colombia consented to be so bound when it exchanged instruments of ratification with the United States. As both Colombia and the United States agree that the Treaty is in force, they both continue to be bound by the Treaty and to have an obligation under international law to return extraditable fugitives (like Arias Leiva) to the requesting state. Arias Leiva's repeated references to a "one-country treaty" in his response are, therefore, fundamentally wrong and misleading.

- Arias Leiva incorrectly asserts that Colombia is not abiding by its Treaty obligations. As the U.S. Department of State has already made clear [DE 54, Ex. 1, at 1], any such suggestion is simply false. The fact that the Colombian Supreme Court struck down Colombia's ratification legislation is entirely separate from Colombia's fulfillment of its international obligations to return extraditable fugitives to the United States.

- Arias Leiva incorrectly asserts that Colombia routinely denies U.S. extradition requests for crimes covered by the Treaty. In fact, the opposite is true. Colombia routinely acts on extradition requests made by the United States and consistently extradites more fugitives to the United States on an annual basis than any other country.

Similarly misguided is Arias Leiva's assertion that it would somehow be unprecedented for this Court to find that the Treaty is in force and to certify his extraditability. Again, the opposite is true. Multiple courts have found the Treaty in force and have certified the extraditability of fugitives to Colombia. Not a single one of these courts has found that the Treaty is not in force. What would be unprecedented is if this Court were to find that the Treaty is not in force, contrary to the views of both parties to it. Then the United States would be unable to fulfill its Treaty obligation to extradite Arias Leiva, thereby potentially forcing the United States—and not Colombia—into violation of international law, not to mention potentially destabilizing the United States's extradition practice worldwide.

### I. Arias Leiva Does Not, and Cannot, Disprove that Ratification of Treaties Is a Political Question

In his response, Arias Leiva fails to address directly the government's argument that whether a treaty was properly ratified is a nonjusticiable political question. Instead, he attempts to divert the Court's attention by arguing that whether a court has jurisdiction over a case is a justiciable question. [DE 56 at 11.] That argument misses the point. The government agrees that this Court must decide whether it has jurisdiction over this case. The government also agrees with Arias Leiva that whether the Court has jurisdiction over this case turns on whether the United States has a valid extradition treaty with Colombia. But, in deciding that issue, the Court must defer to the view of the U.S. Department of State. See Meza v. U.S. Attorney General, 693 F.3d 1350, 1358 (11th Cir. 2012). By stating in this case that the United States has a valid extradition treaty with Colombia, the government is not "manufacturing" jurisdiction, as Arias Leiva claims. [DE 56 at 11.] Rather, jurisdiction exists because, as evidenced by the declarations submitted by the Department of State (and by the Ministry of Foreign Affairs), the Treaty is in force.

In addition, Arias Leiva suggests that the Supreme Court's decision in Doe ex dem. Clark v. Braden, which holds that the issue of ratification is nonjusticiable, and similar decisions by other federal courts, are not on point because they involved "private litigants" claiming that a treaty was not in force. [DE 56 at 13.] This contention is flawed. Arias Leiva overlooks Kastnerova v. United States, an extradition case cited by the government, in which the Eleventh Circuit quoted the Supreme Court's pronouncement in Terlinden v. Ames that the question of "whether power remains in a foreign state to carry out its treaty obligations is in its nature political and not judicial, and . . . the courts ought not . . . interfere with the conclusions of the political department in that regard." [DE 54 at 6.] Moreover, here, it is a private individual—Arias Leiva himself, and not the states—who claims the Treaty is not in force.

Arias Leiva also posits that, because courts may properly interpret a treaty, they may also decide whether a treaty has been duly ratified. But treaty interpretation (what a treaty means) and treaty ratification (whether a treaty has been formally consented to) are decidedly distinct issues, which are treated as such by the courts. Franklin Mint Corp. v. Trans World Airlines, Inc., 690 F.2d 303, 311 (2d Cir. 1982) ("While federal courts are necessarily called upon to interpret treaties, they must observe the line between treaty interpretation on the one hand and negotiation, proposal and advice and consent and ratification on the other."). Moreover, Arias Leiva is wholly incorrect that even in the area of treaty interpretation, courts are free to ignore the view of the Executive Branch. See, e.g., Abbott v. Abbott, 560 U.S. 1, 15 (2010) ("It is well settled that the Executive Branch's interpretation of a treaty 'is entitled to great weight.'") (citation omitted).[1]

---

[1] Arias Leiva's citation to Sanchez-Llamas v. Oregon, 548 U.S. 331 (2006), for the proposition that the Department of State's interpretation of the Treaty is entitled no deference is entirely misplaced. In that case, which holds that the International Court of Justice's interpretation of the

4

## II. The Treaty Is Not One-Sided, But Even If It Were, It Would Remain in Force

Arias Leiva's assertion that the Treaty is one-sided, and thus invalid, is erroneous as matters of both fact and law. The Treaty obligates both countries to "extradite to each other, subject to the provisions described in this Treaty, persons found in [their] territor[ies] . . . ." Art. 1 of the Treaty. As a legal matter, the nullification of Colombia's implementing legislation does not affect this obligation at the international level, and, as a practical matter, it has not affected Colombia's extradition of fugitives to the United States. Colombia accepts U.S. extradition requests, extradites fugitives to the United States in response to those requests, and understands that its own extradition requests are based on the Treaty and that those requests will be processed in accordance with the Treaty. [DE 54, Ex. 1, at 9.] Arias Leiva disputes none of these points—nor can he.

Arias Leiva, instead, cherry-picks a handful of cases in which Colombia has denied U.S. extradition requests and offers those in support of the notion that Colombia fails to observe the Treaty. But he offers no explanation as to why those denials actually represent a failure to observe the Treaty. The requests could have been denied for any of the numerous reasons expressly authorized under the Treaty, such as where the offense is of a political character and/or punishable

---

Vienna Convention on Consular Relations is not binding on federal courts, the Supreme Court explicitly reaffirmed the well-established principle that "[w]hile courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given great weight." Id. at 354-55 (citation omitted). Arias Leiva misrepresents the Court's conclusion in Sanchez-Llamas that courts have an "independent responsibility" to interpret treaties, 457 U.S. at 354—not a responsibility to interpret treaties "'independent from' the political branches," as he suggests [DE 56 at 14].

5

by death, where the statute of limitations has run, and where the fugitive is a citizen of the requested country.[2]

For example, according to the news article provided by Arias Leiva, Colombia denied the United States's request for the extradition of drug kingpin Walid Makled because Venezuela had submitted an earlier request for his extradition. [DE 56, Ex. 1, at 2.] Such a denial is expressly permitted under Article 14 of the Treaty, which allows "[t]he Executive Authority of the Requested State, upon receiving requests from the other Contracting Party and from a third State . . . for the extradition of the same person . . . [to] determine to which of the Requesting States it will extradite that person."[3] Even if Colombia denies some U.S. extradition requests, it is possible for denials to be consistent with the Treaty, and Colombia thus cannot be said to be failing to observe the Treaty.

Even if Colombia did deny U.S. extradition requests for reasons not permitted under the Treaty, such action would not invalidate the Treaty.[4] At most, Colombia would be violating its Treaty obligations. As the Supreme Court stated in Charlton v. Kelly, "[w]here a treaty is violated

---

[2] See, e.g., Art. 4 ("Extradition shall not be granted when the offense for which extradition is requested is of a political character or is connected with [such] an offense . . . ."); Art. 6 ("Extradition shall not be granted when the prosecution or enforcement of the penalty for the offense for which extradition has been sought has become barred by lapse of time according to the laws of the Requesting State."); Art. 7 (establishing circumstances under which "extradition may be refused" where "the offense for which extradition is requested is punishable by death"); Art. 8 ("Neither Contracting Party shall be bound to deliver up its own nationals . . . .").

[3] Arias Leiva neglects to mention that the Colombian Supreme Court approved Makled's extradition to the United States and Venezuela. Ultimately, the Colombian President exercised his executive discretion to extradite Makled to Venezuela.

[4] Indeed, some of the United States's strongest treaty partners occasionally deny extradition. See, e.g., Nate Raymond, Ex-Swiss Banker Goes Home After U.S. Loses Extradition from Germany, REUTERS NEWS, Dec. 9, 2016, 12:06 PM; Matthew Day, Poland Refuses to Extradite Polanski to US, DAILY TELEGRAPH, Dec. 7, 2016, at 15; Gary McKinnon Extradition to US Blocked by Theresa May, BBC NEWS, Oct. 16, 2012.

6

by one of the contracting parties, it rests alone with the injured party to pronounce it broken, the treaty being, in such case, not absolutely void, but voidable, at the election of the injured party . . . ."  229 U.S. 447, 474 (1913) (citation omitted).[5]  There, the Supreme Court held that the extradition treaty between the United States and Italy remained in force notwithstanding Italy's refusal to surrender its own citizens because doing so violated its domestic law.  Id. at 476.  The Court reasoned that "extradition treaties need not be reciprocal."  Id.  Arias Leiva's suggestion that Colombia's failure to abide by the Treaty automatically renders it void is nonsensical and, if adopted, could have sweeping implications for all of the United States's treaty relationships, as it would mean that our partners could terminate their treaty obligations simply by failing to comply with them.

### III.  Under International Law, the Treaty Is in Force

As the Department of State has explained, international law and practice as reflected in the Vienna Convention on the Law of Treaties (the "Vienna Convention"), May 23, 1969, 1155 U.N.T.S. 331, compels the conclusion that the Treaty is in force.  [DE 37, Ex. 1, ¶ 7.]  See United States v. Martinez, 755 F. Supp. 1031, 1033 (N.D. Ga. 1991) (citing to the Vienna Convention in support of the conclusion that the Treaty "remains in force under principles of international law").  Arias Leiva's argument to the contrary is incorrect.

First, the Vienna Convention demonstrates that the Treaty entered into force.  Under Article 24, "[a] treaty enters into force . . . upon such date as it may provide," which in this case, under

---

[5] See also United States v. Cent. Corp. of Ill., No. 87 C 5072, 1987 WL 20129, at *3 (N.D. Ill. Nov. 13, 1987) ("[T]hat the countries might have violated provisions of the treaty does not automatically abrogate the treaty."); Vienna Convention, art. 60(1) (providing that a "material breach of a bilateral treaty by one of the parties entitles the other to invoke the breach as a ground for terminating the treaty or suspending its operation in whole or in part," not that breach automatically terminates the treaty).

Article 21(2) of the Treaty, is March 4, 1982, "the date of the exchange of the instruments of ratification." Article 2(1)(b) provides that "ratification" is "an international act . . . whereby a State establishes on the international plane its consent to be bound by a treaty" (it is not that ratification "occurs when" a state establishes such consent, as Arias Leiva represents [DE 56 at 8]). Colombia's exchange of instruments of ratification of the Treaty thus expressed its consent to be bound by the Treaty. Arias Leiva asserts that, because Colombia's ratification was later deemed unconstitutional in Colombia, Colombia has not expressed its consent to be bound, and the Treaty is not in force. But the Vienna Convention provides otherwise.

As a threshold matter, under Article 46, a state "may not invoke the fact that its consent to be bound by a treaty has been expressed in violation of a provision of its internal law regarding competence to conclude treaties as invalidating its consent unless that violation was manifest . . ." meaning "objectively evident to any State conducting itself in the matter in accordance with normal practice and in good faith." Here, there was certainly no manifest violation; indeed, the Colombian ratification law was not deemed unconstitutional until over six years after its enactment. Thus, Article 46 prohibits Colombia from seeking to invalidate its consent to be bound by the Treaty (or the Treaty itself) based on the nullification of its ratification law. See U.S. DEP'T OF STATE, DIGEST OF UNITED STATES PRACTICE IN INTERNATIONAL LAW 251-52 (2003) (quoting U.S. diplomatic note, which rejected Peru's assertion that its consent to be bound by a multilateral agreement was invalid under Article 46 because its ratification of the agreement violated its political constitution). Furthermore, under Articles 65(1) and 67(1) of the Vienna Convention, if Colombia had wanted to "invoke" a purported "defect in its consent to be bound by [the T]reaty or a ground for impeaching the validity of [the T]reaty [or] terminating it," it would have had to "notify the [United States] of its claim" in writing. It has not done so. [See DE 54, Ex. 1, at 9.]

Second, the Vienna Convention also establishes that the Treaty has never been terminated. Article 54 provides two straightforward options for terminating a treaty: (1) exercising the termination procedures set forth in the applicable treaty (here, Article 21 of the Treaty, requiring that one party notify the other of termination), or (2) obtaining the consent of the other party to terminate the treaty. Colombia has pursued neither option.[6] [DE 54, Ex. 1, at 9.] The extemporaneous statements of the Colombian President and others regarding the invalidity of the Treaty do not in any way affect the operation of the Treaty because, as described above, under Articles 65(1) and 67(1) of the Vienna Convention a party seeking to invalidate or terminate a treaty must do so by notifying the other party in writing.[7]

Thus, as a matter of international law, the Treaty continues in force despite the fact that the Colombian Supreme Court struck down the ratification law, consequently preventing Colombia

---

[6] Arias Leiva argues that Colombia obtained the United States's consent to terminate the Treaty "by agreeing that Colombia did not ratify it" as "manifested . . . by acquiescing in Colombia's refusal to perform its obligations under the Treaty." There is no support whatsoever for this argument in either fact or law (and indeed Arias Leiva cites to none).

[7] None of the other Vienna Convention articles cited by Arias Leiva help his cause. The Treaty plainly meets the definition of a "treaty" under Article 2(1)(a) as "an international agreement concluded between States in written form and governed by international law." Colombia and the United States are "parties" to the Treaty under Article 2(1)(g) of the Vienna Convention because they consented to be bound by it; Colombia's inability to apply the Treaty domestically does not change that fact. Article 7 provides that a person may express a state's consent to be bound by a treaty if (1) they have "full powers" or (2) "[i]t appears from the . . . circumstances that [the states'] intention was to consider that person as representing the State for such purposes and to dispense with full powers"; Arias Leiva fails to explain how the person acting on behalf of Colombia did not have "full powers" to enter into the Treaty and fails to address the latter provision altogether. Article 18 imposes an obligation on states to "refrain from acts which would defeat the object and purpose of a treaty," Article 26 provides that "[e]very treaty in force is binding upon the parties to it and must be performed by them in good faith," and Article 27 states that a party "may not invoke the provisions of its internal law as justification for its failure to perform a treaty." Colombia's record of compliance with these articles, regardless of what it is, has no bearing on whether the Treaty is in force. As discussed above, potential violations of a treaty do not automatically abrogate that treaty.

from applying the Treaty under its domestic law. This situation is analogous to a non-self-executing treaty that lacks implementing legislation in the United States, which cannot be given domestic effect, but the treaty obligations still exist internationally. For example, the Supreme Court in <u>Medellin v. Texas</u> held that, even though obligations of the United States under the non-self-executing United Nations Charter, Optional Protocol Concerning the Compulsory Settlement of Disputes to the Vienna Convention, and International Court of Justice ("ICJ") Statute were not enforceable domestically, the United States remained bound by those obligations as a matter of international law. 552 U.S. 491, 522 (2008) ("[W]hile the ICJ's judgment . . . creates an international law obligation on the part of the United States, it does not of its own force constitute binding federal law that pre-empts state restrictions on the filing of successive habeas petitions."). Likewise, Colombia remains bound by the Treaty even though it does not enforce the Treaty domestically. There is, therefore, no question the Treaty remains in force.

**WHEREFORE**, the United States requests that Arias Leiva's emergency motion to dismiss the complaint and arrest warrant be denied; and, in light of the important U.S. foreign relations concerns raised in this case and the potential impact on future extradition cases, the United States further requests that the Court set a date for a second hearing on the motion.

        Respectfully submitted,

        WIFREDO A. FERRER
        UNITED STATES ATTORNEY

        */s/ Robert J. Emery*
        Assistant United States Attorney
        Court ID No. A5501892
        99 Northeast 4th Street
        Miami, Florida 33132-2111
        Tel: (305) 961-9421
        Fax: (305) 536-4651

*/s/ Christopher J. Smith*
Christopher J. Smith
Acting Associate Director
Office of International Affairs
Criminal Division
U.S. Department of Justice
Court ID No. A5502264
1301 New York Avenue NW
Washington, D.C. 20530
Tel: (202) 532-4254
Fax: (202) 514-0080

*/s/ Rebecca A. Haciski*
Rebecca A. Haciski
Trial Attorney
Office of International Affairs
Criminal Division
U.S. Department of Justice
Court ID No. A5502265
1301 New York Avenue NW
Washington, D.C. 20530
Tel: (202) 616-2534
Fax: (202) 514-0080

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was electronically filed on the 13th day of January, 2017, with the Clerk of the Court using CM/ECF. I further certify that the foregoing document is being served this day on counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ Robert J. Emery*
Assistant United States Attorney