UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 16-23468-MC-O'SULLIVAN

IN THE MATTER OF THE EXTRADITION
OF ANDRES FELIPE ARIAS LEIVA

_____/

## GOVERNMENT'S REPLY MEMORANDUM IN SUPPORT OF EXTRADITION

The United States of America, by and through the undersigned Assistant U.S. Attorney, files this reply memorandum in support of its request for this Court to certify Andres Felipe Arias Leiva ("Arias Leiva") as extraditable to Colombia on the charges of Embezzlement for Third Parties and Conclusion of Contract Without Fulfilling Legal Requirements.

Following a lengthy trial, on July 16, 2014, Colombia's Supreme Court of Justice convicted Arias Leiva of these offenses and sentenced him to 209 months of imprisonment. In its 193-page decision, that court detailed the facts and law underlying its decision. Based upon Colombia's extradition request, the U.S. Attorney sought, and this Court issued, a warrant for Arias Leiva's arrest pursuant to 18 U.S.C. § 3184. That statute provides that this Court must now hold a hearing to determine whether "the evidence is sufficient to sustain the charge under the provisions of the proper treaty," and, if so, the Court must "certify the same" to the Secretary of State. *Id.* As the United States has previously detailed, this Court's certification to the Secretary of State poses a narrow inquiry. In the instant case, that inquiry is particularly narrow because little that is actually relevant to it remains in dispute. To certify Arias Leiva for the Secretary of State's decision on extradition, the Court need only make five findings:

*First*, the Court must find that it is authorized to conduct the extradition proceeding. This Court unambiguously retains subject-matter jurisdiction over this proceeding pursuant to Section 3184. Arias Leiva's arguments about a purported lack of standing ignore that an extradition proceeding is not an Article III case or controversy, and his arguments attacking the Complaint in this case are both misplaced and irrelevant at this juncture. Indeed, the Court has previously found that it "has jurisdiction over the instant extradition proceedings" [DE 59, at 11], and Arias Leiva does not contest that a U.S. magistrate judge in this District is authorized to conduct an extradition proceeding.

*Second*, the Court must find that it has jurisdiction over the fugitive. Pursuant to Section 3184, the Court retains personal jurisdiction over a fugitive "found" in the District. Arias Leiva concedes that this Court has personal jurisdiction over him. [DE 85, at 2.]

*Third*, the Court must find that the applicable treaty—here, the Extradition Treaty with the Republic of Colombia, U.S.-Colom., Sept. 14, 1979, S. Treaty Doc. No. 97-8 (1981) ("the Treaty")—is in force. This Court has already agreed with the views of the United States and Colombia and has found the Treaty "remains in full force and effect." [DE 85, at 10-11.] Although Arias Leiva attempted to *mandamus* this Court regarding its decision on that issue, the Eleventh Circuit dismissed his petition. Order, *In re: Leiva*, No. 17-10946 (11th Cir. Apr. 5, 2017).

*Fourth*, the Court must find that the crimes for which surrender is requested are covered by the applicable treaty. As explained herein, the Colombian Supreme Court's detailed recitation of the conduct underlying Arias Leiva's conviction leaves no doubt that such conduct was punishable in Colombia and would have amounted to embezzlement and false-statement offenses in the United States if it had been committed here, and is thereby covered by the Treaty.

*Fifth*, the Court must find that there is sufficient evidence to support a finding of probable cause as to each charge. The fact that Arias Leiva has already been convicted in Colombia is preclusive on this finding. Arias Leiva cites no authority for a contrary proposition.

Rather than focusing on these issues, Arias Leiva devotes a significant portion of his opposition brief to discussing Colombian politics and to raising other issues that have no bearing on his extraditability. Regardless of whether Arias Leiva's view of Colombian politics is correct,[1] it is irrelevant to any issue properly before the Court. *See, e.g.*, *Ordinola v. Hackman*, 478 F.3d 588, 604 (4th Cir. 2007) ("[T]he motives of the requesting government are irrelevant to our decision."). As detailed herein, the same is true of Arias Leiva's remaining legal arguments.

## I.        THIS COURT HAS JURISDICTION PURSUANT TO 18 U.S.C. § 3184

This Court has subject-matter jurisdiction over this extradition proceeding pursuant to 18 U.S.C. § 3184, which expressly authorizes it to conduct such proceedings. *See, e.g.*, *Jimenez v.*

---

[1] Arias Leiva's brief contains myriad factual assertions which are either false or baseless. [*See, e.g.*, DE 85, at 29 ("No one contends that the Treaty is 'in full force and effect.'"); *id.* at 26 (suggesting that the U.S. Ambassador to Colombia does not view the Treaty as being in force).] The United States does not address them each in turn because they are irrelevant.

*Aristeguieta*, 311 F.2d 547, 553 (5th Cir. 1962); *In re Extradition of Hurtado*, No. 08-22414-MC, 2009 WL 1324215, at *1-2 (S.D. Fla. May 13, 2009); *see also* S.D. Fla. Local Rules, Magistrate J. Local R. 1(a)(3) ("Each United States Magistrate Judge of this Court . . . may . . . [c]onduct extradition proceedings, in accordance with 18 U.S.C. § 3184."). Accordingly, Arias Leiva's arguments that purportedly address subject-matter jurisdiction fail. Furthermore, none of them provides a basis for denying certification of his extraditability.

### A.      The Complaint Was Properly Brought and Executed

An extradition complaint must be "made under oath, charging [the fugitive] with having committed within the jurisdiction of [a] foreign government any of the crimes provided for by [the extradition] treaty or convention [between the United States and that foreign government]." 18 U.S.C. § 3184. This requirement was satisfied when the undersigned Assistant U.S. Attorney swore before this Court on August 11, 2016, that, according to the information provided in the extradition request, Colombia seeks the extradition of Arias Leiva on the charges of Embezzlement for Third Parties and Conclusion of Contract Without Fulfilling Legal Requirements based on actions he took in Colombia when he served as the Minister of Agriculture. [*See* DE 1.]

Arias Leiva's attacks on the Complaint as a means to defeat extradition are misplaced. The complaint in an extradition proceeding allows for the issuance of a warrant for a fugitive's arrest, *see* 18 U.S.C. § 3184; it does not bear on the ultimate extraditability of the fugitive. Thus, an alleged deficiency does not in and of itself prevent the entry of a certification of extraditability, which depends simply upon the five required findings based on the submitted evidence. *See, e.g.*, *Yordi v. Nolte*, 215 U.S. 227, 232 (1909) (affirming denial of habeas corpus petition filed by fugitive who had been certified for extradition, and noting that "the evidence produced at the hearing justified the detention of the [fugitive] and corrected any irregularity in the complaint"); *Shapiro v. Ferrandina*, 478 F.2d 894, 899 (2d Cir. 1973) (concluding that fugitive was extraditable to Israel despite the omission in the complaint of a statement that he may be "found" within the district). However, even to the extent Arias Leiva's attacks on the Complaint may be construed as a reason to dismiss this case and, therefore, to deny certification, they are unavailing.

There is no requirement that the Complaint "invoke" the Treaty, as Arias Leiva suggests [DE 85, at 31-32]. *See, e.g.*, *In the Matter of the Extradition of Tang Yee-Chun*, 674 F. Supp. 1058, 1069 (S.D.N.Y. 1987) (rejecting fugitive's argument that extradition complaint was deficient

because the "existence of a treaty, not proper reference to it, is the statutory requirement"). To the contrary, Section 3184 permits the filing of an extradition complaint merely "[w]henever there *is* a treaty or convention for extradition between the United States and any foreign government, *or* in cases arising under section 3181(b)." 18 U.S.C. § 3184 (emphasis added). And in any event, the United States did invoke the Treaty in the Complaint, averring that "[t]here is an extradition treaty in force between the United States and the Republic of Colombia, U.S.-Colom., Sept 14, 1979, S. Treaty Doc. No. 97-8 (1981)." [DE 1, ¶ 2.]

Neither the extradition statutes nor the Treaty require that an official of the requesting state swear to the allegations in an extradition complaint, as Arias Leiva suggests [DE 85, at 22-24].[2] Rather, an Assistant U.S. Attorney properly files an extradition complaint in his or her capacity representing the United States.[3] *See Eain v. Wilkes*, 641 F.2d 504, 508 (7th Cir. 1981) (explaining that after a foreign country has submitted an extradition request that has been approved by the U.S. Department of State, "[t]he United States Attorney may then file a complaint and seek an arrest warrant from a magistrate"); U.S. Attorney's Manual, Crim. Res. Manual § 614 (Feb. 2007), https://www.justice.gov/usam/criminal-resource-manual-614-procedure-district-court ("Although extradition cases are initiated in response to a foreign government's treaty request, the client of the prosecutor in these cases is the United States and not the foreign government. The prosecutor, when appearing in court in support of the request for extradition, is representing the United States in fulfilling its obligations under the extradition treaty.").

Moreover, "[t]he question of whether an Assistant United States Attorney is a proper party to initiate [extradition] proceedings along with the question of whether his knowledge gained through diplomatic channels is a sufficient basis to support a complaint has long been settled in the affirmative by the Supreme Court." *United States ex rel. Petrushansky v. Marasco*, 215 F.

---

[2] The archaic extradition practice was often for representatives of foreign governments to appear before U.S. courts and swear out the complaints themselves, although the extradition statute in force at that time did not limit that authority to such representatives. *See Grin v. Shine*, 187 U.S. 181, 193 (1902) (holding that R.S. Sec. § 5270, the pre-1940 U.S. extradition statute, authorized "any person making a complaint under oath and acting by the permission or authority of the [foreign] government" to initiate extradition proceedings).

[3] The Treaty requires that the United States "provide for legal representation *to protect the interests of* [Colombia] before the competent authorities of the [United States]," and does not provide for representation *of* Colombia in U.S. courts. Treaty, art. 9(7) (emphasis added).

Supp. 953, 957 (S.D.N.Y. 1963). In particular, when rejecting a fugitive's argument that the extradition complaint was defective, the Supreme Court in *Fernandez v. Phillips* explained:

> The complaint was filed by an Assistant District Attorney of the United States for the District of New Hampshire. It alleged that the complaint was informed 'through diplomatic channel' that the [fugitive] was duly and legally charged by the United States of Mexico with the crime, and on behalf of that government prayed the arrest. Of course whatever form of words was used, the complaint necessarily was upon information, but as appeared at the hearing it was filed by order of the Attorney General, upon request of the Secretary of State, enclosing a request for the extradition from the Mexican Government and a copy of proceedings in a Mexican Court finding that the crime was duly proved against the [fugitive] and ordering his arrest, many pages of evidence being appended. This was enough.

268 U.S. 311, 312-13 (1925); *see also, e.g.*, *Yordi*, 215 U.S. at 231 ("We do not wish, however, to be understood as holding that, in extradition proceedings, the complaint must be sworn to by persons having actual knowledge of the offense charged. This would defeat the whole object of the treaty . . . .") (internal quotation marks and citation omitted). Thus, contrary to Arias Leiva's argument, an Assistant U.S. Attorney may attest to the allegations in an extradition complaint.

Arias Leiva's related argument, that "there is no jurisdiction because the United States cannot establish its standing under Article III of the U.S. Constitution" [DE 85, at 32], fails *ab initio* because, quite simply, "[a]n extradition proceeding is not an ordinary Article III case or controversy."[4] *Martin v. Warden, Atlanta Pen.*, 993 F.2d 824, 828 (11th Cir. 1993); *see also, e.g.*, *Lo Duca v. United States*, 93 F.3d 1100, 1108 (2d Cir. 1996) ("[E]xtradition officers do not exercise judicial power under Article III of the Constitution."). Arias Leiva misunderstands that extradition proceedings are of a "singular nature." *Martin*, 93 F.3d at 828. "[A]n officer who presides over such a proceeding is not exercising 'any part of the judicial power of the United States.' Rather, the officer acts in a non-institutional capacity by virtue of a 'special authority.'"

---

[4] Even if this were not the case, Arias Leiva is incorrect that the United States has no "legally cognizable interest" in extraditing him. [DE 85, at 32.] The United States has an interest in fulfilling its Treaty obligations—which is separate and distinct from Colombia's interest in seeing Arias Leiva serve his post-conviction sentence. *See, e.g.*, *Artukovic v. Rison*, 784 F.2d 1354, 1356 (9th Cir. 1986) ("We note that the public interest will be served by the United States complying with a valid extradition application . . . ."). He is also incorrect that this Court lacks jurisdiction because he "has not committed any crime within the U.S. government's jurisdiction." [DE 85, at 32.] This Court's jurisdiction derives from Section 3184, which applies to certain crimes "committed within the jurisdiction of any . . . foreign government."

*In re Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993) (quoting *In re Kaine*, 55 U.S. (14 How.) 103, 120 (1852); and *In re Metzger*, 46 U.S. (5 How.) 176, 191 (1847)). In particular, the authority of the judge in an extradition proceeding is delegated by the Executive through statute and a treaty entered into under Article II of the Constitution. *See Matter of Requested Extradition of Smyth*, 61 F.3d 711, 720-21 (9th Cir. 1995), *amended sub nom. Matter of Smyth*, 73 F.3d 887 (9th Cir. 1995); *Martin*, 93 F.3d at 828; *see also In the Matter of the Extradition of Martinelli Berrocal*, No. 17-22197, 2017 WL 2908361, at *2 (S.D. Fla. July 7, 2017) ("This is an administrative proceeding arising under international law for certification and approval of the State Department's decision to extradite this person at the request of a foreign government.").

**B.      This Court's Finding that the Treaty Is in Force Governs This Case**

As a separate "jurisdictional" challenge, Arias Leiva continues to attempt to litigate whether the applicable treaty in this case is in force [DE 85, at 24-31], seemingly ignoring this Court's unequivocal finding that the Treaty is, in fact, in force [DE 59].[5] In his opposition brief, Arias Leiva repeats the arguments he previously raised, none of which are supported by the law or the evidence in this case. He argues (as he did previously) that the diplomatic note submitted by Colombia in this case does not confirm that the Treaty is in force [DE 85, at 30], ignoring Colombia's statement in its note that the Treaty "continues in force" [DE 54-1, at 8], the statement of the U.S. Department of State that the diplomatic note "confirms that the Government of Colombia shares the same position as the United States . . . that the treaty remains in force" [DE 54-1, at 1], and the statement of the Court that "[t]he Diplomatic Note states that Colombia considers the Extradition Treaty to be in effect" [DE 59, at 5].

Arias Leiva also argues (as he did previously) that specific examples of Colombia's denial of U.S. extradition requests somehow prove that the Treaty is not in force, but the Court has already expressly rejected this argument, stating: "The fact that the Colombian government has, at times, refused some of the United States' requests for extradition is immaterial. It is not out of the ordinary that a country, for a multitude of reasons, refuses an extradition request." [DE 59, at 7.] Arias Leiva contests this Court's finding, contending that Colombia only denies U.S. extradition

---

[5] The Court's prior finding decided this issue and governs this case. "[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 816 (1988).

requests because it never ratified the Treaty [DE 85, at 26], but this contention is unsupported speculation. Moreover, Arias Leiva's argument that the Treaty is not in force given recent isolated denials of U.S. extradition requests is countermanded by the fact that Colombia has also granted a number of U.S. extradition requests in recent months,[6] and that U.S. courts have continued to find that the Treaty is in force, *see In re the Matter of the Extradition of Camelo-Grillo*, No. CV 16-9026 JVS (SS), 2017 WL 2945715, at *5 (C.D. Cal. July 10, 2017) (certifying fugitive for extradition to Colombia), and generally that they must defer to the view of the U.S. Department of State in this regard, *see In the Matter of the Extradition of Fletcher*, No. MC 16-00334 KJM, 2017 WL 1034199, at *4 (D. Haw. Feb. 1, 2017) ("The existence of a valid treaty of extradition between the United States and the Kingdom of Tonga is a political question about which courts defer to the executive branch."). Accordingly, this Court should hold to its finding that the Treaty is in force.

## II.     THE CRIMES FOR WHICH ARIAS LEIVA HAS BEEN CONVICTED IN COLOMBIA ARE ENCOMPASSED BY THE TREATY

The Treaty permits Arias Leiva's extradition for both offenses of which he was convicted because those offenses meet the requirements of Article 2 of the Treaty. The Appendix to the Treaty explicitly lists the offense of "Embezzlement." *See* DE 82, at 12. Arias Leiva fails to address this fact, which establishes that the crime is encompassed by the Treaty. Moreover, had Arias Leiva committed both of his offenses in the United States, his conduct would be criminal under 18 U.S.C. § 641 and 18 U.S.C. § 666, which each carry a maximum punishment of ten years' imprisonment when the embezzled sum is greater than $1,000, and under 18 U.S.C. § 1001, which carries a maximum punishment of five years' imprisonment.

### A.     U.S. Federal Law Criminalizes the Conduct Underlying Arias Leiva's Embezzlement Conviction

#### 1. Factual Summary

The Supreme Court of Justice convicted Arias Leiva of Embezzlement for Third Parties, in violation of Article 397 of the Colombian Criminal Code, which carries a maximum punishment

---

[6] *See, e.g.*, Press Release, Dep't of Justice, International Narcotics Transporter Extradited from Colombia (May 26, 2017), https://www.justice.gov/usao-edny/pr/international-narcotics-transporter-extradited-colombia; Oliver Griffin, *Colombia Extradites 8 'Narcos', Including Former Venezuelan Military Official*, Colombia Reports (July 5, 2017), https://colombiareports.com/colombia-extradites-8-narcos-including-former-venezuelan-military-official/.

of fifteen years' imprisonment. *See* Colombia Supreme Court of Justice, Criminal Cassation Division, Case No. 37462, Approved Minutes 226, July 16, 2014 (hereinafter "Conviction"), at 186-87.[7] As Colombia's Minister of Agriculture and Rural Development, Arias Leiva was responsible for implementing a program called Agro Ingreso Seguro ("AIS"), which, *inter alia*, was supposed to provide direct government assistance in the agricultural sector to reduce inequality in rural areas. *Id.* at 61 & 69. One component of the AIS program was the provision of subsidies to select investment projects in irrigation systems through a "public contest." *Id.* at 77. Arias Leiva exercised control over this contest, *id.* at 137, 143, & 167, which turned out to be a "scandal," *id.* at 165, rife with "fraud," *id.* at 161, 162, & 166, and which resulted in over $8 million in public funds being illegally appropriated to eleven Colombian families and companies which Arias Leiva "wished to favor" (collectively, "families"), *id.* at 167 & 191. According to the Colombian prosecution, "[t]he Minister's true purpose was shown in the trial, where it was established that the beneficiaries of the program were called to support [Arias Leiva's] political campaign." *Id.* at 24.[8]

The fraudulent means by which public funds were diverted to the eleven families included awarding subsidies to families who had fictitiously subdivided their properties "to make it appear that [the subsidy] was for independent systems for different assets" in violation of Colombian law. *Id.* at 160, 164. The fraud also included awarding subsidies to families who had submitted multiple proposals through different partners or legal representatives, even though in some cases the proposals were identical. *See, e.g.*, *id.* at 143, 160. Further, the fraud included awarding subsidies to families who submitted "defective" Request for Proposals ("RFPs") which had been "reclassified," even though such reclassification did not address the proposals' deficiencies. *Id.*[9]

---

[7] The Colombian Supreme Court decision is included within the bound extradition papers submitted to the Court as Government's Exhibit #1 to the Complaint for Extradition, DE 1. The Colombian Conviction (English translation) begins at handwritten page 445, top right hand corner of the page. For ease of reference, all page citations to the Conviction refer to the Conviction's original pagination, which is located at the bottom, center of the page.

[8] Ultimately, Colombia's Supreme Court held that the prosecution had proven Arias Leiva committed the offenses of which he was charged regardless of whether the AIS program was used to benefit his campaign. Conviction at 182.

[9] *See, e.g.*, Conviction at 150 (proposal approved after initial rejection despite fact that reclassification did not address the "techniques and bad design which justified their exclusion");

In the Colombian court proceedings, Arias Leiva strenuously argued that he was not responsible for any fraudulent conduct. Colombia's Supreme Court unambiguously rejected that defense as "nothing more than a way of eluding his responsibility." *Id.* at 164. Rather, the court found that:

- Arias Leiva was a "**co-perpetrator** responsible by way of **fraud**." *Id.* at 161 (emphasis added).

- "These said reasons allow us to ascribe to Dr. Arias-Leiva the **irregular fraudulent allocation** of subsidies in detriment to the public national treasury." *Id.* at 166 (emphasis added).

- Arias Leiva "**knew of the illegality** of his conduct and **voluntarily carried it out**." *Id.* at 162 (emphasis added).

- Arias Leiva "**fixed the bases** for this [subdivision] to occur and was aware of this, because he always controlled and arranged the management of the resources of the RFP." *Id.* at 164 (emphasis added).[10]

- Arias Leiva "gave orders or took the decision that allowed the selection of the interested party to be directed to those beneficiaries **whom he wished to favor**." *Id.* at 167 (emphasis added).[11]

In conclusion, Colombia's Supreme Court held that Arias Leiva was "aware of the illegality of his conduct" and that his culpability was "clear." *Id.* at 169.

## 2.  18 U.S.C. § 641 Criminalizes Arias Leiva's Conduct

The elements required for a conviction under Section 641 are as follows: (1) the money described in the indictment belonged to the United States; (2) the defendant embezzled, stole, or

---

*see also id.* at 146 (proposal approved after initially declared non-viable despite fact that technical and economic inadequacies of the project were not addressed).

[10] As further evidence of Arias Leiva's knowledge of the illegality of subdivisions, Colombia's Supreme Court cited an Econometria S.A. report stating that such subdivisions would be contrary to regulations. *See* Conviction at 163 n.333. The Supreme Court conclusively rejected Arias Leiva's contention that he was unaware of the report. *Id.* at 162-63. These factual findings are conclusive in this extradition proceeding.

[11] *See also* Conviction at 161 (Arias Leiva was "involved in the irregular allocation, in which he intervened through the design of the TOR of the RFP, the classification and the approval of the eligible projects made as mentioned."); *id.* at 162 (Arias Leiva's conduct was of a "fraudulent nature"); *id.* at 167 ("[N]o action whatsoever was carried out without [Arias Leiva's] approval and it was he who had the capacity to take the final decisions because of his intervention on the Management Committees that approved the lists of beneficiaries and defined the projects to be subsidized.").

knowingly converted the money to his own use or to someone else's use; (3) the defendant knowingly and willfully intended to deprive the United States of the use or benefit of the money; and (4) the money had a value greater than $1,000.[12] *See* Eleventh Circuit Pattern Jury Instructions (Criminal) (hereinafter "Pattern"), Offense Instruction No. 21 (2016); *see also, e.g.*, *United States v. McCree*, 7 F.3d 976, 980 (11th Cir. 1993). Arias Leiva's conduct would satisfy each of those elements if it had been committed here.

*First*, the money for the irrigation and drainage projects belonged to Colombia and, therefore, under analogous circumstances, would have belonged to the United States. *See, e.g.*, Conviction at 128 ("It has [] been shown that in the Agreements referred to, Dr. Arias-Leiva committed and delivered public funds corresponding to the budget assigned to the Ministry of Agriculture and Rural Development.").

*Second*, Arias Leiva diverted money that was required to be used for the purpose of "reducing inequality in country areas" to eleven families through allocations that were fraudulent and in violation of Colombian law. *See, e.g.*, Conviction at 160 ("Obtaining subsidies by the fictitious subdivision of properties establishes undue appropriation of State resources as, in addition to opposing its founding principles, is clearly in violation of Law 1133 of 2007 . . . ."); *id.* at 166 (ascribing to Arias Leiva the "fraudulent allocation of subsidies in detriment to the public national treasury"). This action amounted to "embezzlement," which is defined as "wrongfully or intentionally tak[ing] someone else's money or property after lawfully taking possession or control of it." Pattern, Offense Instruction 21; *see also McRee*, 7 F.3d at 980 (describing second element as "fraudulently appropriat[ing] the money or property to his own use or the use of others").

*Third*, Arias Leiva knowingly and willfully deprived Colombia of the subsidies that were illegally misdirected to the eleven families. *See, e.g.*, *id.* at 162 (Arias Leiva "knew of the illegality of his conduct and voluntarily carried it out."); *see also id.* at 161, 164, 166, 167.

*Fourth*, Arias Leiva's multi-million dollar embezzlement, *id.* at 169, 191, is far in excess of Section 641's $1,000 threshold.

---

[12] Section 641 reads in part: "Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof . . . [s]hall be fined under this title or imprisoned not more than ten years, or both . . . ."

Indeed, courts have repeatedly found that Section 641 prohibits public officials from disbursing federal funds in an unauthorized manner. *See, e.g.*, *United States v. Eagleman*, Nos. 88-3071, 88-3088, 1989 WL 52630, at *1 (9th Cir. May 10, 1989) (unpublished) (affirming Section 641 convictions of defendants who approved benefits to ineligible member of Native American Indian tribe); *In re Necolaiciuc*, No. 2:09–mc–21, 2011 WL 798144, at *3 & 15 (M.D. Fla. Mar. 1, 2011) (in extradition proceeding, applying Section 641 where fugitive, among other things, exercised control over the procurement process and transacted with "unsuitable companies" in contravention of Romanian regulations); *Seguy v. United States*, 329 F. Supp. 2d 883, 886-87 (S.D. Tex. 2004) (in extradition proceeding, applying Section 641 where director of national oil company was charged with, among other things, abusing his authority by misapplying funds and making illegal payments, because under federal law, "it is illegal for a government official to . . . use government funds for a use other than the authorized one"). Here, Arias Leiva's allocations to the eleven Colombian families were not only unauthorized but also fraudulent and directly contrary to Colombian law. *See, e.g.*, Conviction at 160.

### 3.   18 U.S.C § 666 Criminalizes Arias Leiva's Conduct

Although Section 641 alone is sufficient for this Court to find that the dual criminality requirement has been met, 18 U.S.C § 666 (a)(1)(A) provides an alternative basis. The elements required for a conviction under Section 666 are as follows: (1) the defendant was an agent of the entity claimed to have been affected; (2) the entity was an organization, State government, local government, Indian tribal government, or any agency thereof, that received in any one-year period, benefits in excess of $10,000 under a Federal program involving a form of Federal assistance; (3) the defendant embezzled, stole, obtained by fraud, knowingly converted to the use of any person other than the rightful owner without authority, or intentionally misapplied property that was owned by the affected entity; and (4) the property had a value of $5,000 or more.[13] *See* Pattern

---

[13] Section 666 provides in relevant part: "(a) Whoever, if the circumstance described in subsection (b) of this section exists—(1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof—(A) embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that—(i) is valued at $5,000 or more, and (ii) is owned by, or is under the care, custody, or control of such organization, government, or agency . . . shall be fined under this title, imprisoned not more than 10 years, or both. (b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period,

11

Offense Instruction No. 24; *see also, e.g.*, *United States v. Keen*, 676 F.3d 981, 989 (11th Cir. 2012). Arias Leiva's embezzlement of funds from a government program is covered by this statute for substantially the same reasons that his misconduct is covered by Section 641. *See, e.g.*, *United States v. Sanderson*, 966 F.2d 184, 188 (6th Cir. 1992) ("Thus it seems that Congress intended section 666 to augment the general theft statute of section 641. Accordingly, we look at section 641 and its applicability to prosecutions for multiple actus reus elements.").

Contrary to Arias Leiva's contention, his embezzlement from a government program is dually criminal regardless of whether his position in the Colombian government is more akin to a federal employee than a state employee. Section 666, like Section 641, targets embezzlement by government employees, and the fact remains that the Colombian and United States statutes are dually criminal because they "deal roughly with the same type of charge or evil." *In the Matter of Grynsztein*, No. 15-mc-80918, 2015 WL 6039845, at *8 (S.D. Fla. Oct. 15, 2015); *see also Peters v. Egnor*, 888 F.2d 713, 719 (10th Cir. 1989) ("When 'the laws of both the requesting and the requested party appear to be directed to the same basic evil,' the statutes are substantially analogous, and can form the basis of dual criminality.") (quoting *Shapiro*, 478 F.2d at 908); *see also, e.g.*, *Ye Gon v. Holt*, 774 F.3d 207, 217 (4th Cir. 2014) ("[D]ual criminality requires only that the offenses in the two countries punish the same basic evil; it does not require that the offenses contain identical elements.").

4.   Arias Leiva's Efforts to Deny the Applicability of Sections 641 and 666 Fail

Arias Leiva's various attempts to explain why dual criminality may not be found based on Sections 641 and 666 are unavailing. He is incorrect that there must be clear evidence of a quid pro quo in order to sustain a conviction against a government official for embezzlement under 18 U.S.C. § 641 or 18 U.S.C. § 666(a)(1)(A).[14] The sole case that Arias Leiva cites in support of this contention—*McDonnell v. United States*, 136 S. Ct. 2355 (2016)—is entirely inapposite.

---

benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance."

[14] Regardless, evidence in the record demonstrates a quid pro quo. As the Colombian prosecution noted, "[t]he Minister's true purpose was shown in the trial, where it was established that the beneficiaries of the program were called to support the political campaign of the then-political candidate for the presidency for the Conservative party, Andres Felipe Arias." Conviction at 24.

*McDonnell* did not address Section 641, Section 666, or even embezzlement more generally. Rather, the case concerned the federal bribery statute, 18 U.S.C. § 201, which criminalizes a public official's receipt of anything of value in return for being influenced in the performance of any official act. *Id.* at 2365 (citing 18 U.S.C. § 201(b)(2)). In particular, "[t]he issue in [*McDonnell*] [wa]s the proper interpretation of the term 'official act.'" *Id.* at 2367. The Court rejected the government's proffered construction and instead "adopt[ed] a more bounded interpretation" of that term. *Id.* at 2368. An "official act" is a required element of neither Section 641 nor Section 666, the applicable statutes here,[15] and the Eleventh Circuit has flatly rejected attempts by defendants to graft quid pro quo requirements onto other federal statutes, including the bribery provision of Section 666. *See United States v. McNair*, 605 F.3d 1152, 1188 (11th Cir. 2010) ("[W]e now expressly hold there is no requirement in § 666(a)(1)(B) or (a)(2) that the government allege or prove an intent that a specific payment was solicited, received, or given in exchange for a specific official act, termed a *quid pro quo*."); *United States v. Jackson*, No. 16-10946, 2017 WL 1969667, at *8 (11th Cir. May 12, 2017) (unpublished) (refusing to reconsider holding that § 666(a)(1)(B) does not require a quid pro quo). Regardless, Arias Leiva's misconduct is covered under Section 641 and the *embezzlement* provision of Section 666, 18 U.S.C. § 666(a)(1)(A). Thus, this Court need not determine whether Arias Leiva's conduct is covered by the *bribery* provisions of Section 666, *see* 18 U.S.C. § 666(a)(1)(B), 666(a)(2).

Arias Leiva is also incorrect that the First Amendment would pose a bar to prosecuting him for embezzlement. As an initial matter, the embezzlement charge is not dependent on the campaign contributions, and, therefore, any First Amendment arguments based on such contributions would not defeat the prosecution. *See, e.g.*, *United States v. Baroni*, 2:15-cr-00193, 2017 WL 787122, at *4 (D.N.J. Mar. 1, 2017) (unpublished) ("Defendants' argument that the statute improperly criminalizes political activities is not persuasive. That argument conflates motive (political considerations) with *mens reas* and conduct (intentional misapplication) . . . . [T]he former is merely the reason a defendant may engage in activities that violate Section 666, while the latter is

---

[15] Regardless, in this case, it is clear that the act in question—the allocation of subsidies under the color of an official government program—is an "official act." *See, e.g.*, *United States v. Repak*, 852 F.3d 230, 253 (3d Cir. 2017) (stating that "a decision by the JRA—a governmental agency—to award money to contractors as part of its public mission to develop Johnstown's infrastructure is undoubtedly the formal exercise of governmental power").

what triggers prosecution under the statute."). Moreover, the First Amendment does not "prohibit the evidentiary use of speech to . . . prove motive or intent," *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993), which in this case is what the campaign contributions from the beneficiaries of the illegal subsidies show. *See, e.g.*, *Seguy*, 329 F. Supp. 2d at 878 (finding that "[g]iving millions of pesos to the Union in the months leading up to the presidential election is another circumstance allowing an inference of the true purpose"). The First Amendment also does not shield fraud, *see, e.g.*, *Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 612 (2003), and Colombia's Supreme Court conclusively found Arias Leiva's conduct was fraudulent, *see, e.g.*, Conviction at 161, 166.

The fraudulent nature of Arias Leiva's allocations also forecloses any argument that the allocation to the eleven Colombian families was a proper and non-justiciable exercise of his political discretion. *See, e.g.*, *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1361 (9th Cir. 1988) ("Bribetaking, theft, embezzlement, extortion, fraud, and conspiracy to do these things are all acts susceptible of concrete proofs that need not involve political questions."); *see also Alexander v. Todman*, 337 F.2d 962, 968 (3d Cir. 1964) ("Issues revolving around allegations of conspiracy and fraud are to be adjudicated within the context of this 'political case.'"). Similarly, Arias Leiva's analogy to politicians who enact tax cuts for the wealthy misses the mark. The key distinction is that Colombia's Supreme Court found that the allocations were made through illegal and fraudulent means. *See, e.g.*, Conviction at 160; *see, e.g.*, *Seguy*, 329 F. Supp. 2d at 879 ("[A] loose budgetary process is not a license to steal or divert funds.").

Finally, Arias Leiva's argument that his conduct was careless rather than willful was soundly rejected by the Colombian court: "The disinterest [Arias Leiva] now shows is nothing more than a way of eluding his responsibility . . . ." Conviction at 164; *see also id.* at 134, 161-62, 164, 167. The court's factual findings, which were based on extensive witness testimony and documentary evidence, cannot be re-litigated in this extradition proceeding.

  **B.** **U.S. Federal Law Criminalizes the Conduct Underlying Arias Leiva's Conviction for Conclusion of Contract Without Fulfilling Legal Requirements**

   1. Factual Summary

Colombia's Supreme Court of Justice also convicted Arias Leiva for Conclusion of Contract Without Fulfilling Legal Requirements, in violation of Article 410 of the Colombian

Criminal Code, which carries a punishment of up to eighteen years' imprisonment. This conviction arose out of Arias Leiva's selection of the Inter-American Institute of Cooperation for Agriculture ("IICA") as a contractor to administer AIS program funds, in circumvention of Colombia's legally required public procurement process, including the "public contest" through which the subsidies related to the irrigation and drainage projects were fraudulently allocated to the eleven families. *See* Conviction at 106 ("[T]he selection of IICA to operate the RFP was decided by Dr. Arias-Leiva directly."). In general, direct contracting, without holding any public competition, is prohibited under Colombian law, although certain exceptions are allowed, including for special scientific and technology cooperation agreements. *Id.* at 74-76. Colombian law provides a defined list of "scientific and technological activities." *Id.* at 73-76.

In order to bypass the required procurement process for the AIS contractor, Arias Leiva falsely designated the agreements between the Ministry of Agriculture and IICA as scientific and technical cooperation agreements. *Id.* at 76, 86, 93. Those agreements—3/2007, 55/2008, and 52/2009 (hereinafter, the "Agreements")—were signed by Arias Leiva on behalf of the Ministry of Agriculture. *See id.* at 121, 124. Colombia's Supreme Court expressly held that the representation in the Agreements that their object was "technical and scientific cooperation between the Ministry and IICA" was false: "[The Agreements] did not have scientific or technological activities as any part of their object." *Id.* at 120; *see also id.* at 101 (stating that "since the true purpose of this juristic business did not allow—by express recognition of the law—a contract to be made directly with IICA, they resorted to the figure of *special science and technology agreements*") (emphasis in original); *see also id.* at 82, 86, 88, 96, 98, 121.

The Colombian court found that Arias Leiva willfully made the false representations:

- "[Arias Leiva] willingly, and **knowing that he was acting illegally**, departed from the legal order to process and execute the Agreements questioned." *Id.* at 113 (emphasis added).

- "[Arias Leiva] knew of his obligation to observe the administrative procurement statute" but "despite that, **willingly sidestepped the rules**, by processing and executing [the Agreements], which did not have scientific or technological activities as any part of their object." *Id.* at 120 (emphasis added).

- "[T]he final result is a consequence of the **fraudulent actions** of [Arias Leiva], in that he willingly processed and signed the oft cited agreements, disregarding essential requirements of the law of public procurement . . . ." *Id.* at 121 (emphasis added).

15

- "[T]he evidence supplied accredits something which is not the violation of an objective duty of care, but the performance of **eminently fraudulent conduct**." *Id.* (emphasis added).

The court identified three reasons why Arias Leiva made the false representations to ensure IICA was directly selected as the contractor for the AIS program. *First*, Arias Leiva requested and received funds from IICA that were administered by his "private secretary" to "pay amongst other things for charter flights, lunches and per diems." *Id.* at 122-123. The court found that this had "no legal justification, because public funds do not admit this type of management." *Id.* at 123. *Second*, the selection of IICA enabled Arias Leiva to maintain control of the AIS program and to "guide[] the delivery of funds earmarked for [re]mediation and drainage." *Id.* at 119, 134; *see also id.* at 104 (Arias Leiva had a "direct relationship and a relationship of authority with the IICA contractors"); *id.* at 128 (Arias Leiva "secured control of [the] funds through the mode of contract selected"); *id.* ("IICA received amounts earmarked for the irrigation and drainage RFPs, and the Minister retained his legal rights to dispose of them"); *id.* at 129 ("[T]hanks to the organization available to administer the agreements, for which Dr. Arias Leiva intervened in the design and approval of the TOR for the RFPs, he was able to influence the process of classification of the projects presented, and the fact that the Minister [] reserved powers to approve the lists of eligible proposals."). *Third*, the court found that IICA was selected to advance Arias Leiva's interest in executing funds allocated to the irrigation and drainage components as soon as possible. *Id.* at 120.

## 2.   18 U.S.C. § 1001 Criminalizes Arias Leiva's Conduct

The elements required for a Section 1001 conviction are: (1) the defendant made the statement, or made or used the document, as charged; (2) the statement or document was false; (3) the falsity concerned a material matter; (4) the defendant acted willfully, knowing that the statement or document was false; and (5) the false statement or false document was made or used for a matter within the jurisdiction of a department or agency of the United States.[16] Pattern Offense Instruction No. 36. Arias Leiva's conduct would satisfy each of those elements.

---

[16] Section 1001 provides in relevant part: (a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—(1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact; (2) makes any materially false, fictitious, or fraudulent statement or representation; or (3) makes or uses any false writing or document knowing

*First*, Arias Leiva made and used documents containing false statements. He "ordered the initiation of procedures" that led to the execution of the Agreements, which falsely state that their object is the "technical and scientific cooperation between the Ministry and IICA," and he signed the Agreements on behalf of the Ministry of Agriculture. *See id.* at 76, 113, 118. Pursuant to the Agreements, the Ministry of Agriculture committed "an important percentage of its investments funds for the agro sector with IICA." *Id.* at 122; *see also id.* 127-28 (disbursements under the three Agreements totaled more than $76 million under the current exchange rate).

*Second*, the representation that the Agreements were for "[t]echnical and scientific co-operation between the Ministry and IICA" was false. *Id.* at 76, 86, 93. Colombia's Supreme Court held that the Agreements "did not have scientific or technological activities as any part of their object." *See id.* at 120; *see also id.* at 82, 86, 88, 96, 98, 121. In reaching this conclusion, the court cited, among other things, witness testimony that Arias Leiva selected IICA "not to make science or technology transfers or innovation of any kind—a criterion but which was not even mentioned—but to implement an RFP designed to deliver the recently approved funds for the program to private parties." *See id.* at 106.[17]

*Third*, the false representations contained in the Agreements signed by Arias Leiva were material. A false statement is material if it "has a natural tendency to influence or be capable of influencing the government agency or department in question." *United States v. Lawson*, 809 F.2d 1514, 1520 (11th Cir. 1987); *see also* Pattern Offense Instruction No. 36. Here, the Supreme Court found that through the false "figure of *special science and technology agreements*," Arias Leiva was able to circumvent the legally required public bidding process and to ensure public funds were disbursed to his preferred contractor, IICA. *See id.* at 101 (emphasis in original); *see also id.* at 113 (stating that the Agreements "impaired the principles of legality, transparency, economy and responsibility"). A misrepresentation to the government regarding the nature of a transaction in order to induce the government to expend funds violates Section 1001. *See, e.g.*, *United States v. Kramer*, 521 F.2d 1073, 1078-79 (10th Cir. 1975) (affirming conviction of defendant who "falsely

---

the same to contain any materially false, fictitious, or fraudulent statement or entry; shall be fined under this title, imprisoned not more than 5 years . . . ."

[17] Section 1001 applies where, as here, there is a factual misrepresentation in an agreement. *See United States v. Blankenship*, 382 F.3d 1110, 1132-33 (11th Cir. 2004) (overturning Section 1001 conviction where there was "not a single false statement in any of the equipment leases").

represent[ed] in the SBA application the purposes for which the loan guaranty was to be made"); *Corcoran v. United States*, 229 F.2d 295, 299 (5th Cir. 1956) (affirming conviction of defendant for his role in the submission of false documents to a federal agency regarding the purpose of a home loan guaranty); *see also United States v. Herring*, 916 F.2d 1543, 1547-48 (11th Cir.1990) ("Herring's false statements to the Georgia Department of Labor had the intrinsic capability of influencing the Secretary of Labor in administering the federal unemployment funds.").

*Fourth*, as shown above, Arias Leiva acted willfully. "[T]o establish a willful violation of a statute, generally 'the Government must prove that the defendant acted with knowledge that his conduct was unlawful.'" *United States v. Clay*, 832 F.3d 1259, 1308 (11th Cir. 2016) (quoting *Bryan v. United States*, 524 U.S. 184, 191-92 (1998)). Here, Colombia's Supreme Court held that Arias Leiva "willingly, and knowing that he was acting illegally, departed from the legal order to process and execute the Agreements questioned." *See* Conviction at 113; *see also id.* at 120-21. The court further found that Arias Leiva's motives for making false misrepresentations, at least in part, had to do with receiving funds from IICA to pay for "charter flights, lunches and per diems," which had "no legal justification." *Id.* at 123. The court also found that through IICA, Arias Leiva was able to maintain his control over the distribution of the funds, which were fraudulently allocated to the eleven Colombian families, as previously discussed. *See, e.g.*, *id.* at 104, 119, 128-29, 134. In addition, the court found that IICA served Arias Leiva's interest by ensuring that the funds for the irrigation and drainage projects were distributed as quickly as possible. *Id.* at 120.

*Fifth*, under analogous circumstances, the jurisdictional element of a Section 1001 offense would be satisfied. "The United States Supreme Court has stated that jurisdiction within the meaning of section 1001 should not be narrowly or technically defined." *Herring*, 916 F.2d at 1547 (citing *United States v. Rodgers*, 466 U.S. 475, 480 (1984)). The "primary purpose" of the jurisdictional requirement "is to identify the factor that makes the false statement an appropriate subject for federal concern." *United States v. Yermain*, 468 U.S. 63, 68 (1984). "A department or agency has jurisdiction, in this sense, when it has the power to exercise authority in a particular situation." *Rodgers*, 466 U.S. at 479. Here, the Agreements were made directly with the Colombian Ministry of Agriculture, and, thus, the Ministry had the power to exercise authority over them. Further, the false representations in the Agreements directly affected the Ministry from both a monetary and reputational standpoint. Indeed, the Ministry was tainted by this fraud. *See*

18

Conviction at 124 (noting the "deterioration of the State's image" resulting from "[p]ublic functions [being] placed at the service of private interests—those of the Minister"); *see also id.* at 113 (The Agreements "impaired the principles of legality, transparency, economy and responsibility").

"Section 1001 is necessarily couched in very broad terms to encompass the variety of deceptive practices which ingenious individuals might perpetrate upon an increasingly complex government." *United States v. House*, 684 F.3d 1173, 1205 (11th Cir. 2012) (citation and quotation marks omitted); *see also Rodgers*, 466 U.S. at 480 (stating Section 1001 was designed to protect "myriad governmental activities"); *United States v. Stanford*, 589 F.2d 285, 297 (7th Cir. 1978) (Congress intended "that the statute apply whenever false statements would result in the perversion of the authorized functions of a federal department or agency") (citing *United States v. Gilliland*, 312 U.S. 86, 93 (1941)); *Trifonov v. Fox*, No. C14-0366JLR, 2014 WL 3735419, at *13 (W.D. Wash. July 28, 2014) (finding that Section 1001 provided a basis for dual criminality based on false documents presented to custom officials by a fugitive who was charged with attempting to assist undocumented foreign nationals to cross the Bulgarian border). As explained above, its coverage would extend so as to criminalize Arias Leiva's conduct.

       3.   <u>Arias Leiva's Attempts to Deny the Applicability of Section 1001 Fail</u>

Arias Leiva's arguments as to why his conduct is not criminal under Section 1001 in analogous circumstances fail. His contention that dual criminality is not met because the Colombian and federal statutes do not "overlap" applies the wrong legal standard. "The law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries. It is enough if the *particular act* charged is criminal in both jurisdictions." *Collins v. Loisel*, 259 U.S. 309, 312 (1992) (emphasis added); *DeSilva v. DiLeonardi*, 125 F.3d 1110, 1113 (7th Cir. 1997) ("If the acts of the accused are considered criminal in both nations, extradition follows even if the requesting country does not have a criminal statute analogous to the one that makes the acts criminal in the United States."). Here, the conduct giving rise to Arias Leiva's conviction under Article 410 of the Colombian Criminal Code was the false denomination of the Agreements as scientific and technical. *See* Conviction at 86, 88, 96, 98, 120, 121. This misrepresentation would be punishable under Section 1001 in analogous circumstances here.

Arias Leiva also seeks impermissibly to re-litigate in this extradition proceeding the Supreme Court of Justice's conclusion that, as a matter of Colombian law, the object of the Agreements was not the advancement of science and technology. That court's interpretation and application of Colombian law is dispositive. *See, e.g.*, *Casey v. Dep't of State*, 980 F.2d 1472, 1477 (D.C. Cir. 1992) ("Surely, a foreign court's holding as to what that country's criminal law provides should not lightly be second-guessed by an American court—if it is ever reviewable.").[18] For similar reasons, Arias Leiva's invitation for this Court to undertake a due process analysis of the Colombian law governing scientific and technical activities should be rejected. *See, e.g.*, *Neely v. Henkel*, 180 U.S. 109, 122 (1901) (holding various provisions of the Constitution "have no relation to crimes committed without the jurisdiction of the United States against the laws of a foreign country"); *Prushinowski v. Samples*, 734 F.2d 1016, 1018 (4th Cir. 1984).[19]

## III.   ARIAS LEIVA'S CONVICTION ESTABLISHES PROBABLE CAUSE

While not contesting the United States' assertion that well-settled case law provides that "a foreign conviction automatically establishes probable cause," Arias Leiva argues that an exception to this rule should be made for "judgments of politicized courts." [DE 85, at 55]. Arias Leiva cites no support for this unprecedented exception. *Cf. Spatola v. United States*, 925 F.2d 615, 618 (2d Cir.1991) ("[W]here there has been a judgment of conviction entered by a foreign court, there is no need for an 'independent' determination of probable cause: the relator's guilt is an adjudicated fact which a fortiori establishes probable cause."). His argument also contradicts the Treaty, which, in the case of a convicted fugitive, requires the requesting country to provide nothing more about the conviction other than a copy of the judgment. [*See* DE 82-1, Article 9(4).]

Moreover, such an exception would impermissibly require the Court to stray into areas reserved for the Secretary of State. In particular, the general rule in extradition proceedings is that questions of political motivation should be considered exclusively by the Secretary. *See, e.g.*,

---

[18] Further, Arias Leiva's attempt to frame the issue as whether the irrigation project itself was scientific or technical was rejected by Colombia's Supreme Court, which found that the appropriate inquiry was whether the Agreements with IICA themselves provided for scientific and technological activities. *See* Conviction at 120-21.

[19] In any event, Colombian law on what constitutes "scientific and technological activities" is not overly broad. The statute, relevant portions of which are reproduced in the Supreme Court's decision, provides a list of activities that fall within this category. *See* Conviction at 75-76.

*Koskotas v. Roche*, 931 F.2d 169, 174 (1st Cir. 1991) ("Extradition proceedings are grounded in principles of international comity, which would be ill-served by requiring foreign governments to submit their purposes and procedures to the scrutiny of United States courts."); *Eain*, 641 F.2d at 516 ("[E]valuations of the motivation behind a request for extradition so clearly implicate the conduct of this country's foreign relations as to be a matter better left to the Executive's discretion."), *cert. denied*, 454 U.S. 894 (1981); *In the Matter of the Extradition of Marzook*, 924 F. Supp. 565, 578 (S.D.N.Y. 1996) ("[T]he political motivation of the prosecution is not a business in which this court may delve."); *In the Matter of Locatelli*, 468 F. Supp. 568, 575 (S.D.N.Y. 1979) (rejecting fugitive's argument that criminal charges were motivated by revenge, and noting that "I am simply without jurisdiction to look behind the charges as propounded by the Swiss Government and must, in this respect, yield this inquiry to the Secretary of State"). The same is true of questions relating to the fairness of the requesting state's justice system. *See, e.g.*, *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997) ("Under the rule of non-inquiry, courts refrain from investigating the fairness of a requesting nation's justice system.") (citation and internal quotation mark omitted). Accordingly, this Court should disregard any allegations of the political nature of Arias Leiva's conviction when making its probable cause determination.[20]

## IV.   NEITHER THE POLITICAL QUESTION DOCTRINE NOR THE ACT-OF-STATE DOCTRINE PROVIDES A DEFENSE TO EXTRADITION

Arias Leiva raises two purported defenses to extradition, the non-justiciable political-question doctrine and the act-of-state doctrine, neither of which is relevant to this Court's certification of his extraditability. [DE 85, at 41-54.] He claims that this Court is barred from considering whether he correctly designated the relevant Agreements as "scientific and technical" because such a designation was a policy matter delegated to his discretion as the Colombian Minister of Agriculture. [*Id.* at 48-49.] He also argues that his execution of the Agreements was lawful because he was acting in his "official capacity" and "exercising [Colombia's] sovereign authority" in so doing. [*Id.* at 43, 50-52.] Arias Leiva's arguments are meritless.

---

[20] Furthermore, the judgment does not appear to have been politicized. Indeed, Arias Leiva was partially acquitted, as the Supreme Court of Justice found that he committed embezzlement by diverting funds to the eleven families, but "absolve[d]" him of committing embezzlement by diverting funds to IICA. Conviction, at 193.

Both the political-question doctrine and the act-of-state doctrine arise out of separation-of-powers considerations, which guide courts in determining whether to show restraint in favor of the expertise of another branch of the government when handling "political questions" and managing international relations. *See*, *e.g.*, *Aktepe v. United States*, 105 F.3d 1400, 1402 (11th Cir. 1997); *Jimenez*, 311 F.2d at 558. The former "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution" by the executive and legislative branches. *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986). The latter "precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964). Although they are related, they are different in that the political-question doctrine provides a "defense to justiciability," while the act-of-state doctrine provides a "substantive defense on the merits," *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 52 (D.D.C. 2010). Neither applies here.

As an initial matter, there is no political question or act of state involved in this extradition proceeding. The fact that Arias Leiva was a public official at the time that he contracted with IICA does not convert the evaluation of his criminality into a non-justiciable political question. *See Philippines*, 862 F.2d at 1361 ("Our courts have had no difficulty in distinguishing the legal acts of a deposed ruler from his acts for personal profit that lack a basis in law. . . . [T]he latter acts are as adjudicable and redressable as would be a dictator's act of rape.") (internal citations omitted); *Republic of Philippines v. Westinghouse Electric Corp.*, 774 F. Supp. 1438, 1464-65 (D.N.J. 1991) (rejecting argument that evaluation of Filipino criminal statutes prohibiting "bribery, graft, and other forms of corruption" created a "political question" lacking "judicially discoverable and manageable standards"). Similarly, act-of-state immunity does not attach to criminal acts an official commits for his private political benefit. *See Yousuf v. Samantar*, 699 F.3d 763, 775 (4th Cir. 2012) (foreign official immunity is not available "for private acts that are not arguably attributable to the state, such as drug possession or fraud"); *Jimenez*, 311 F.2d at 558  (acts of embezzlement by former Venezuelan president were not acts of state because they were "common crimes committed by the Chief of State done in violation of his position and not in pursuance of it"); *United States v. Emmanuel*, No. 06-20758-CR, 2007 WL 2002452, at *14 (S.D. Fla. July 5, 2007) (torture allegedly committed by the son of the Liberian president who was empowered to

command Liberian forces, although "made possible because the wrongdoer is clothed with authority of law, are insufficient to constitute allegations of sovereignty"); *see also United States v. Noriega*, 746 F. Supp. 1506, 1521-22 (S.D. Fla. 1990) (noting that the distinction between public and private acts of government officials "has not prevented courts from scrutinizing the character of the conduct in question"), *aff'd*, 117 F.3d 1206 (11th Cir. 1997).

Moreover, the Court does not need to consider whether the Agreements were correctly designated or lawfully executed at all because, as discussed above, Colombia's Supreme Court has already decided those questions in the negative. This Court must take those findings as true. *See, e.g.*, *In re Lukes*, No. 2:02-MC-23-FTM, 2003 WL 23892681, at *4 n.6 (M.D. Fla. May 8, 2003) ("The Court accepted the Government's rendition of the facts as true for the purposes of extradition."); *Castro Bobadilla v. Reno*, 826 F. Supp. 1428, 1433 (S.D. Fla. 1993), *aff'd*, 28 F.3d 116 (11th Cir. 1994) (fugitive may not contradict the requesting country's evidence); *see also In re Solis*, 402 F. Supp. 2d 1128, 1131-32 (C.D. Cal. 2005); *In re Extradition of Cheung*, 968 F. Supp. 791, 794 n. 6 (D. Conn. 1997); *Marzook*, 924 F. Supp. at 592; *In re Extradition of Atta*, 706 F. Supp. 1032, 1050-51 (E.D.N.Y. 1989) (citing *Collins*, 259 U.S. at 315-16). Thus, it is not this Court that is sitting in judgment of Arias Leiva's actions, as Arias Leiva suggests; that role was already properly fulfilled by Colombia's Supreme Court.

Regardless, even if there were a political question or act of state at issue here, Arias Leiva fails to explain how the political-question doctrine or act-of-state doctrine bears on his extraditability. They do not. To the extent he may understand them as precluding the dual criminality requirement from being met, questions of justiciability do not affect whether the charged conduct is criminalized under the laws of Colombia and the United States. *See, e.g.*, *Lo Duca*, 93 F.3d at 1112 (in conducting the dual criminality analysis, courts "look[] towards the *conduct* of the accused to see if it falls within the proscription of American criminal law") (emphasis added); *Camelo-Grillo*, 2017 WL 2945715, at *9 ("The dual criminality requirement does not consider possible affirmative defenses or procedural rules that would bar prosecution by the requesting or requested party. The question is whether the fugitive's acts would be criminal in both countries."); *In re Extradition of Sidali*, 899 F. Supp. 1342, 1347 (D.N.J. 1995) ("Clearly, the alleged acts are punishable regardless of the notion of double jeopardy. The only inquiry the Court must make here is whether the alleged crime or act is punishable in each country."). To the extent

he may understand those doctrines as precluding the probable cause requirement from being met, as explained above, the Court need not and should not look beyond Arias Leiva's conviction make that finding. And to the extent Arias Leiva generally invokes the doctrines as an affirmative defense in this proceeding, that is improper.[21] *See, e.g.*, *DeSilva*, 125 F.3d at 1112 ("Affirmative defenses not specified in the treaty may not be considered."); *Martinelli Berrocal*, 2017 WL 2908361, at *12 ("Immunity is a defense Pres. Martinelli may raise if he is tried in Panama, but it is not relevant at this stage."); *Grynsztein*, 2015 WL 6039845, at *4 ("Courts have determined that affirmative defenses to the merits of the charges are not to be considered at extradition hearings.").

In addition, with respect to the act-of-state doctrine, U.S. courts avoid "adjudicat[ing] the validity of an act of a foreign government under its own law" because doing so "would imperil the amicable relations between governments and vex the peace of nations." *Jimenez*, 311 F.2d at 558 (citation and internal quotation marks omitted). Such policy considerations are not at play where, as here, the U.S. executive branch "has manifested its desire that the judiciary act and decide [an extradition] case on its merits." *See id.*; *see also In re Grand Jury Proceedings Bank of Nova Scotia*, 740 F.2d 817, 832 (11th Cir. 1984) ("[W]hen the executive branch of our Government announces that it does not oppose inquiry by American courts into the legality of foreign acts, an exception to the judicial abnegation required by the act of state doctrine has arisen."). Accordingly, the doctrine does not provide a defense to this extradition. *See Jimenez*, 311 F.2d at 558. Indeed, the government is unaware of any case in which the act-of-state doctrine, or the political-question doctrine, has been successfully raised as a defense in an extradition proceeding.

---

[21] Because the political-question and act-of-state doctrines do not go to the merits of the Colombian charges, and because Arias Leiva attempts to raise them as an excuse to avoid extradition, they are properly viewed as affirmative defenses. *Cf. United States v. Beasley*, 346 F.3d 930, 934 (9th Cir. 2003) (an affirmative defense to a criminal offense can excuse the charged conduct but does not disprove any of the elements of the offense); *see United States v. Sum of $70,900,605*, 4 F. Supp. 3d 189, 204 (D.D.C. 2014) (labeling the act-of-state doctrine an affirmative defense to civil *in rem* forfeiture action brought by the U.S. government against several banks); *Joint Tribal Council of Passamaquoddy Tribe v. Morton*, 388 F. Supp. 649, 664 (D. Me. 1976) (labeling the political-question doctrine an affirmative defense in land-related dispute between Indian tribe and several U.S. state and federal government defendants). Arias Leiva is incorrect that issues related to separation of powers, such as the two doctrines he raises, cannot be viewed as affirmative defenses. *United States v. Philip Morris USA*, 316 F. Supp. 2d 19, 24 (D.D.C. 2004).

## V.   SUPREME COURT PRECEDENT REQUIRES RESOLVING AMBIGUITIES IN THE APPLICATION OF THE TREATY IN FAVOR OF EXTRADITION

Arias Leiva is incorrect that the "law decidedly does not encourage courts to resolve all doubts in favor of extradition." [DE 85, at 58.] He acknowledges, as he must, that the Supreme Court has mandated that any ambiguities in an extradition treaty (which could include, for example, the application of a dual criminality provision) must be liberally construed so as to give effect to the apparent intention of the parties in entering into the treaty, *i.e.*, "to impose mutual obligations to surrender individuals." [*Id.* at 57 (emphasis omitted) (citing *Valentine v. U.S. ex rel. Neidecker*, 299 U.S. 5, 10 (1936); and *United States v. Alvarez-Machain*, 504 U.S. 655, 664 (1992)).] However, he attempts to contort this principle, by reference to Colombia's denial of certain U.S. extradition requests, somehow to mean the opposite, that the Treaty should be interpreted in favor of denying extradition. This argument defies logic and finds no support in the case law. Any recent denials of extradition by Colombia (particularly when also viewed in the broader context of others cases in which it granted extradition) in no way mean that its intent in entering into the Treaty over forty years ago was not the mutual surrender of fugitive. Its recent denials also in no way mean that it is not mutually obligated to surrender fugitives.

This Court has previously explained that "[i]n applying an extradition treaty, the Court is to construe it liberally in favor of the requesting nation." *In re Cifuentes Gonzales*, No. 09-23376, 2010 WL 1330128, at *1 (S.D. Fla. Mar. 29, 2010) (O'Sullivan, J.); *accord Nezirovic v. Holt*, 779 F.3d 233, 239 (4th Cir. 2015) ("We construe extradition treaties liberally in favor of surrendering a fugitive to the requesting country."); *Kin-Hong*, 110 F.3d at 110 ("[E]xtradition treaties, unlike criminal statutes, are to be construed liberally in favor of enforcement."). It should apply that principle equally in this case.

**WHEREFORE**, the United States requests that the Court certify to the Secretary of State the extradition of Arias Leiva for each of the charges for which his extradition has been sought.

Respectfully submitted,

BENJAMIN G. GREENBERG
ACTING UNITED STATES ATTORNEY

*/s/ Robert J. Emery*
Assistant United States Attorney
Court ID No. A5501892
99 Northeast 4th Street
Miami, Florida 33132-2111
Tel: (305) 961-9421
Fax: (305) 536-4651

*/s/ Christopher J. Smith*
Christopher J. Smith
Acting Associate Director
Office of International Affairs
Criminal Division
U.S. Department of Justice
Court ID No. A5502264
1301 New York Avenue NW
Washington, D.C. 20530
Tel: (202) 532-4254
Fax: (202) 514-0080

*/s/ Rebecca A. Haciski*
Rebecca A. Haciski
Trial Attorney
Office of International Affairs
Criminal Division
U.S. Department of Justice
Court ID No. A5502265
1301 New York Avenue NW
Washington, D.C. 20530
Tel: (202) 616-2534
Fax: (202) 514-0080

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was electronically filed on the 21st day of July, 2017, with the Clerk of the Court using CM/ECF. I further certify that the foregoing document is being served this day on counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

                                        */s/ Robert J. Emery*
                                        Assistant United States Attorney

27